# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**FAITH KOHLER,**
　　　　　**Plaintiff,**

　　**v.**　　　　　　　　　　　　　　　**Case No. 15-C-0439**

**MEGAN J. BRENNAN,**
**POSTMASTER GENERAL,**
　　　　　**Defendant.**
_____

## <u>DECISION AND ORDER</u>

Faith Kohler alleges that her former employer, the United States Postal Inspection Service ("USPIS"),[1] discriminated against her based on her gender and retaliated against her for filing a charge of discrimination. Before me now is the defendant's motion for summary judgment, along with two related administrative motions.

## I. BACKGROUND

The United States Postal Inspection Service is the law enforcement arm of the United States Postal Service. In 2013, it was divided into three geographic regions known as "Field Offices." These field offices consisted of eighteen "Divisions." The divisions were themselves made up of multiple sub-regions known as "Domiciles." Each Division was administered by an Inspector-in-Charge and one or more Assistant Inspectors-in-Charge. Each Domicile was administered by supervisory-level employees known as Team Leaders, who supervised teams of Postal Inspectors within their

---

[1] Technically, the defendant is Megan Brennan, the Postmaster General. However, because the plaintiff worked for the USPIS, I will treat that agency as the defendant.

Domicile and reported to the Assistant Inspector-in-Charge responsible for their Domicile.

USPIS's Chicago Division fell within the Western Field Office and was composed of nine Domiciles: Green Bay, Madison, Milwaukee, Chicago, Irving Park (O'Hare Airport), Carol Stream, Springfield, Peoria, and St. Louis. Between 2002 and 2013, the plaintiff was employed as a Postal Inspector in the Milwaukee Domicile of the Chicago Division. In 2007, Thomas Brady became the Inspector-in-Charge of the Chicago Division, and he remained in that position until he retired from the USPIS on March 29, 2013. When Brady retired, Antonio Gomez became the Inspector-in-Charge of the Chicago Division. William Hedrick is an Assistant Inspector-in-Charge of the Chicago Division.

In August 2012, the plaintiff filed what the parties refer to as an "Informal EEO Complaint" with the Equal Employment Opportunity Office of the United States Postal Service against Brady and Lori Groen, who was the plaintiff's Team Leader at the time. The complaint alleged that Brady and Groen had discriminated against her based on her gender by not providing her with "details," which are temporary assignments to vacant positions that last until the vacancy is filled. The purpose of assigning an inspector to a detail is to allow him or her to develop new skills or improve existing skills. If the detail position involved a higher pay grade, the inspector would receive a pay increase during the detail. Brady learned that the plaintiff had filed her EEO complaint against him no later than October 19, 2012.[2]

_____

[2] In the present lawsuit, the plaintiff does not allege a claim of discrimination against the USPIS based on Brady and Groen's failure to assign her to details.

2

On September 11, 2012, Brady selected the plaintiff for a 90–120 day detail as a team leader in the Milwaukee Domicile. Brady extended the plaintiff's assignment to this detail on January 16, 2013.

On February 5, 2013, USPIS began accepting applications to permanently fill the Milwaukee team-leader position to which the plaintiff had been detailed. The plaintiff and four other USPIS employees applied for the permanent position. The parties agree that Thomas Brady was the person responsible for selecting the permanent team leader. However, they also agree that, as a training exercise, Brady asked William Hedrick, an Assistant Inspector-in-Charge in the Chicago Division, to participate in the selection process by reviewing the applications, joining the interviews, and providing his opinions. As explained in more detail below, Brady eventually selected Francis Pilon, a male who, as far as Brady knew, had not filed any EEO complaints.

To apply for the team-leader position, each applicant had to submit a written application known as "PS Form 991." As the first step in the selection process, Brady and Hedrick each completed a "matrix" that yielded a numerical score for each applicant. Brady completed the matrix in a way that gave the plaintiff the second highest score among the five applicants, and that gave Pilon the third highest score. Hedrick's matrix gave Pilon the highest score and the plaintiff the second highest score. Both Brady and Hedrick scored James Gursky the lowest, and for this reason he was eliminated from consideration without receiving an interview. The plaintiff contends that Brady and Hedrick used the matrix scores as a pretext to eliminate Gursky from consideration, as they viewed him as being "disloyal" to the USPIS. Their perception

3

that Gursky was disloyal stemmed from his decision to take a job outside the USPIS while the USPIS was going through "tough times."  Pl.'s Stmt. of Add'l Facts ¶ 26.

During the interview process, Brady and Hedrick posed identical questions to the four remaining candidates from the same printed form.  After each interview, Brady made handwritten notes regarding the candidate's responses to the questions on the form and gave each response a numerical score.  He then totaled the responses for all questions to arrive at an overall numerical score for the candidate's interview.  Brady scored Pilon the highest and the plaintiff third.  Hedrick also made handwritten comments on the form about the candidate's answers to each question, but he did not give the candidates' responses numerical scores.  At some point, Brady made adjustments to his scoring of the candidates based on his "broader knowledge of the overall applicant and interview pool."  Decl. of Thomas Brady ¶ 27.  Brady then selected Pilon for the position.  Hedrick concurred with Brady's decision.

The parties agree that the plaintiff and Pilon had different qualities, skills, and experiences from each other, and that reasonable people selecting between them could have different opinions about which qualities were most relevant to the team-leader position.  Pl.'s Resp. to Def.'s Prop. Findings of Fact ("PFOF") ¶¶ 56–59.  Brady and Hedrick state that they deemed Pilon the best candidate primarily because he performed the best during the interviews.  Def.'s PFOF ¶¶ 60, 62, 64, 66.  Brady states that, in evaluating the candidates, he was looking for someone who demonstrated leadership and an ability to think quickly and creatively, and who best responded to questions during the interview.  *Id.* ¶ 61.  Brady states that he selected Francis Pilon for the team-leader position because he came into the interview more prepared than the

4

others, gave articulate answers, showed creativity, handled the scenario-based leadership questions the best, and ultimately received the highest interview score. *Id.* ¶ 62. Although Brady does not contend that the plaintiff did poorly during the interviews, he did give her zero points for an interview question about confidential informants. *Id.* ¶ 64. As for Hedrick, he states that his primary considerations for a team leader included the applicants' knowledge of technical processes, self-described leadership styles, innovation ideas, ability to communicate, and the ability to articulate their preferred methods of dealing with conflict as well as recognizing good performance. *Id.* ¶ 65. Hedrick states that he concurred in the selection of Pilon because Pilon distinguished himself during the interview by providing examples of what he had done, knowing the correct responses to technical questions, articulating good responses to scenario-based leadership questions, and conducting himself in a professional manner. *Id.* ¶ 66.

On Tuesday, March 26, 2013, Brady called the plaintiff to tell her that she had not been selected for the position. The next day, the plaintiff emailed Brady and Hedrick to request feedback on her application and interview. On Friday, March 29, 2013, which was Brady's last day of work before retiring from the USPIS, Brady responded to the plaintiff's email and copied his response to Hedrick. In his response, Brady apologized to the plaintiff for not having time to personally give her feedback, and he directed her to seek feedback from Hedrick.

On April 1, 2013, Hedrick asked the plaintiff to meet with him during the week of April 15 to discuss her application and interview. On April 11, 2013, the plaintiff emailed Brian Haraway, her team leader in Milwaukee, and stated "I wonder when I'm going to

5

get my bullshit feedback from Bill [Hedrick]."  On April 17, 2013, Hedrick met with the plaintiff in the Chicago office.  During this meeting, Hedrick told the plaintiff that he did not know the exact reasons why Brady selected Pilon for the position rather than her.  However, Hedrick gave her some feedback on her interview performance, describing it as good.  Hedrick also states in his deposition that he told the plaintiff that he thought Pilon performed better than she did during the interviews.  Hedrick Dep. at 85.  During this meeting, the plaintiff was visibly upset about not receiving the team-leader position and told Hedrick that she was considering leaving the agency.  She also told Hedrick that her long-term goal was to work in USPIS's Miami office.  She also told Hedrick that she would have difficulty working with Pilon as her team leader.  In response, Hedrick told the plaintiff that he would make arrangements for her to work under a different team leader in Milwaukee.

On June 10, 2013, the plaintiff filed a formal complaint of discrimination with the Postal Service's EEO office.  She alleged that Brady's decision to not select her for the permanent Milwaukee team-leader position was motivated by her gender and also constituted retaliation for her prior, informal gender-discrimination complaint against Brady and Groen.

On July 27, 2013, Brady's permanent successor, Antonio Gomez, arrived in Chicago to take over as Inspector-in-Chief.  Gomez's prior position in the USPIS was located in the Miami office, where the plaintiff wished to relocate.  During the Spring of 2013, the Chicago Division contacted Gomez in Miami and told him that the plaintiff was interested in a position there.  During this conversation, Gomez learned that the plaintiff had filed an EEO complaint about her non-selection for the Milwaukee team-leader

6

position.  On July 2, 2013, the plaintiff learned that she was not selected to interview for the Miami position.

In the present lawsuit, in addition to alleging that her non-selection for the Milwaukee team-leader position was discriminatory, the plaintiff alleges that, in the months following her internal complaint about the non-selection, Gomez and Hedrick retaliated against her for making this complaint by denying her requests to participate in certain training and career-development opportunities.  I will describe the facts surrounding these opportunities and Gomez and Hedrick's handling of her requests in the analysis section below.  The plaintiff filed an internal EEO complaint alleging retaliation for these actions on November 12, 2013.  *See* Compl. ¶ 54; Answer ¶ 54.

In September 2014, the plaintiff resigned from the USPIS to take a position in the private sector.  After exhausting her administrative remedies with respect to her non-selection and retaliation complaints, the plaintiff commenced the present suit.  She contends that she was not selected for the Milwaukee team-leader position because of gender discrimination and because Brady retaliated against her for her earlier complaint about not being assigned to details because of her gender.  She also contends that, after she filed her complaint regarding her non-selection for the team-leader position, Gomez and Hedrick engaged in a series of retaliatory actions involving her requests for training and development opportunities.  The defendant has moved for summary judgment on these claims.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

7

56(a). When considering a motion for summary judgment, I take evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Section 717(a) of Title VII of the Civil Rights Act of 1964 prohibits federal employers from discriminating against federal employees and applicants on the basis of gender. 42 U.S.C. § 2000e-16(a). Although Title VII contains no express anti-retaliation provision applicable to federal employment, the defendant does not dispute that Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), which prohibits retaliation in private employment, also applies to federal employment. *See also Hale v. Marsh*, 808 F.2d 616, 619 (7th Cir. 1986).

At the summary-judgment stage of an employment-discrimination case, a court will often refer to the "direct" and "indirect" methods of proof. However, the Seventh Circuit has cautioned district courts against separating the plaintiff's evidence into different piles labelled "direct" and "indirect" and evaluating each pile under different legal standards. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016). Rather, a district court should evaluate the evidence as a whole, under a single legal standard, namely: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. However, this does not mean that the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is sometimes is referred to as an "indirect" means of proving employment discrimination, cannot be used. *See Ortiz*, 834 F.3d at 766.

8

Still, the burden-shifting framework is not always useful. It is least useful when the defendant offers a legitimate, non-discriminatory reason for favoring the employee or applicant without the plaintiff's protected characteristic. When the defendant gives such a reason, then the burden shifts to the plaintiff to show that the reason is a pretext and that unlawful discrimination was the true reason. *See, e.g., Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661–63 (7th Cir. 2016). But to show this, the plaintiff will just point to all the evidence in the case and say that this evidence, when viewed in its entirety, permits the factfinder to reasonably conclude that the plaintiff's protected characteristic caused the adverse employment action, which then necessarily implies that the defendant's purported reason is pretextual. So the question of pretext is the same as the general question that must be asked at the summary-judgment stage in every employment-discrimination case. There is thus no reason to discuss the burden-shifting framework when the defendant gives a non-discriminatory reason for its action. *See, e.g., Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013) (noting that in cases where question is whether employer's purported reason is pretextual, there is little difference between direct and indirect methods).

In the present case, the defendant has put forth non-discriminatory reasons for all but one of the alleged adverse employment actions.[3] Thus, I will generally ignore the burden-shifting framework and will instead just evaluate all of the evidence in light of the governing legal standard of whether the plaintiff's gender and/or EEO activity, rather than the defendant's purported reasons, caused the alleged adverse employment

---

[3] The single exception is the plaintiff's non-selection for a task-force detail, which I discuss in more detail below.

9

actions.  I begin with the plaintiff's non-selection for the Milwaukee team-leader position and then turn to the denials of the plaintiff's requests for training and development opportunities.

**A.  Team Leader Non-Selection**

The evidence shows that the plaintiff and Pilon were both qualified for the Milwaukee team-leader position and that it would have been reasonable for Brady to select either one of them for the position.  Brady states that he selected Pilon over the plaintiff because of Pilon's interview performance.  Brady states that he thought Pilon was more prepared for the interview than the other candidates, showed creativity, and handled scenario-based leadership questions the best.  Brady's perception of Pilon's interview performance is buttressed by Hedrick's concurrence in the selection decision. In describing why he thought Pilon did the best in the interview, Hedrick states that Pilon distinguished himself by providing examples of what he had done, knowing the correct responses to technical questions, articulating good responses to scenario-based leadership questions, and conducting himself in a professional manner.

The plaintiff contends that she has shown that Brady's stated reasons are a pretext for discrimination, and that Brady actually selected Pilon because he was a man and/or because he had not filed an EEO complaint.  First, she notes that Brady's reasons are subjective, in that different people might have different ideas of what qualifies as a good interview performance.  It is true that evaluating a candidate's interview performance involves some subjectivity, but this alone does not support a reasonable inference of pretext.  At most, a subjective decision-making process merely "set[s] the stage" for discrimination to occur.  *See Richter v. Hook-SuperRx, Inc.*, 142

10

F.3d 1024, 1032 (7th Cir. 1998). But the plaintiff still has the burden of showing that the decisionmaker acted on a discriminatory motive. *Id.*; *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 515 (7th Cir. 1996) ("Demonstrating that an interview process is influenced by subjective factors does not go any distance toward proving that [the plaintiff's protected characteristics] were among those subjective factors."). Thus, to show pretext, the plaintiff must produce evidence supporting a reasonable inference that Brady took advantage of the subjectivity inherent in judging the interviews to commit unlawful discrimination.

Next, the plaintiff contends that the reasons Brady gave for selecting Pilon are not credible because they are vague and conclusory. It is true that, to some extent, Brady's reasons are vague and conclusory. For example, Brady does not explain what Pilon did in the interview to show that he was "creative." But on the other hand, the record supports the conclusion that Pilon in general answered interview questions better than the plaintiff did, which both Brady and Hedrick cited as a reason for selecting Pilon for the job. For example, Brady gave the plaintiff a zero for her answer to a technical question about how to register a confidential informant. *See* ECF No. 20-13 at p. 5. His written critique indicates that she did not know the answer to the question. *Id.* Hedrick's written critique for this question also indicates that the plaintiff did not know the answer. ECF No. 21-7 at p. 5. In contrast, Brady gave Pilon 2.5 points (out of a possible 3) for his answer to this question, and Brady and Hedrick's written critiques suggest that Pilon answered this question correctly. *See* ECF No. 20-15 at p. 5; ECF No. 21-9 at p. 5. The plaintiff has not argued that either Brady or Hedrick unfairly judged her response to the question or that this question was not relevant to the

11

position of team leader.  She has not otherwise attempted to show that Pilon did not have better answers to the interview questions than she did.[4]  Thus, although the defendant's reasons for selecting Pilon are to some extent vague and conclusory, they are not so facile that they do not discharge the defendant's burden to provide a nondiscriminatory reason for the adverse employment action or raise a reasonable inference that they are pretexts for unlawful discrimination.

The plaintiff also contends that Brady suspiciously contradicted himself at his deposition by stating that he made his hiring decision based on the totality of the circumstances but then later admitting that he did not consider circumstances that favored the plaintiff, including that she had worked 12 years in the Milwaukee Domicile, had relevant law-enforcement contacts in Milwaukee, and had been assigned a detail involving the very job for which she was interviewing.  However, while it is true that Brady testified that he did not consider some of these factors, the context of his testimony makes clear that what he actually meant was that although he considered these factors, he assigned them little weight.  For example, although Brady said that the plaintiff's having worked twelve years in Milwaukee was "not a factor at all" in his decisionmaking, he went on to explain that he did not deem prior service in the position's location to be a good indicator of whether the candidate would be successful in the position.  Brady Dep. at 121.  This was because Brady had himself been

---

[4] I understand that it is not easy for the plaintiff to prove that Pilon did not perform better in the interviews than she did, as she was not present for Pilon's interview and also judging an interview performance is somewhat subjective.  But Brady and Hedrick's written comments shed some light on Pilon's performance during the interview, and the plaintiff has not pointed to anything in these comments which suggests that Brady and Hedrick are lying when they say that Pilon gave better answers to questions during his interview.

12

successful when assigned to locations with which he had no prior familiarity.  *Id.*  So Brady's testimony on these matters does not contradict his claim to have considered the totality of the circumstances.  And Brady's reasons for assigning some of the factors that favored the plaintiff less weight are plausible and do not raise an inference that he arbitrarily discounted these factors.  *See* Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 34–38 (citing Brady's deposition testimony in which he gives reasons for discounting certain factors that favored the plaintiff).

Next, the plaintiff argues that one of Brady's answers during his deposition suggests that he harbored animosity towards the plaintiff because she had filed an EEO complaint against him in 2012.  The 2012 complaint was the one in which the plaintiff accused Brady and another supervisor, Lori Groen, of refusing to assign her to details because of her gender.  At the deposition, plaintiff's counsel asked Brady whether he considered the plaintiff to be a loyal employee even though she had filed the EEO complaint against him in 2012.  Brady Dep. at 124.  In the course of answering this question, Brady stated that he "would never even think of making a decision based upon the fact that someone . . . filed an EEO."  *Id.* at 125.  He then made a comment that is not clearly recorded in the transcript in which he said "it's an affront."  *Id.*  Plaintiff's counsel followed up on this response by asking "And you said personally to you it is an affront?"  Brady gave the following response:

> Yeah.   It's insulting to me as an executive in this organization for somebody who's working in the organization for 26 years and has never made a decision based on any factor except who's the best for that position, whether it's a detail, whether it's a permanent position.   You know, whatever it may be, any decision.  You know, deciding what team someone goes with.

13

I take a great deal of pride in making sure all my decisions are the right ones, so it's insulting to someone, to sit here and hear that someone has filed a[n] EEO and thinks that that's going to motivate someone to do something. No, you do the right thing, and that's what I've always done.

Brady Dep. at 125–26. The plaintiff contends that Brady's comment about an EEO complaint being an "affront" and "insulting" to him is evidence of animosity toward the plaintiff for filing the EEO complaint against him in 2012.[5]

Brady's comment certainly indicates that he was insulted by the plaintiff's accusations against him. However, the comment does not also imply that Brady harbored animosity, *i.e.*, feelings of ill will or hatred, towards the plaintiff because she had filled an EEO complaint against him. It is natural for someone to feel insulted when accused of unlawful discrimination, especially when the person believes that he or she made the decision at issue for lawful reasons. But this does not give rise to an inference that the person will retaliate against the employee for making the accusation. Really, the plaintiff's retaliation claim would be precisely as strong as it is now even if Brady had not made this comment. That is because it is reasonable to infer that a person accused of discrimination would be offended by the accusation, even if he or she never made a statement to that effect. For these reasons, Brady's comment is not entitled to the same weight as a comment suggesting animosity towards a person because of their race, gender, or other protected characteristic. *Compare Hitchcock*, 718 F.3d 733, 740–41 (7th Cir. 2013) (describing the kinds of comments that reflect

---

[5] The defendant contends that Brady's comment referred not to the plaintiff's 2012 EEO complaint, but to her 2013 EEO complaint accusing Brady of retaliating against her for filing the 2012 complaint. The defendant is probably correct about that, but this does not affect the argument that the plaintiff is making. If Brady was personally offended by the plaintiff's most recent EEO complaint against him, he would likely also have been personally offended by the 2012 complaint against him.

14

animosity towards pregnant women and stereotypes about pregnant women in the workforce, and that constitute evidence of pretext). Still, in evaluating the plaintiff's claim of pretext, I keep in mind that Brady was offended by the plaintiff's accusations, and that this at least gave him a motive to retaliate against her. Thus, the plaintiff's claim of retaliation is stronger than it would be had Hedrick, whom the plaintiff had not accused of discrimination, been the sole decisionmaker. But Brady's having a reason to retaliate against the plaintiff is not enough, on its own, to raise a reasonable inference that he acted on it by denying her the team-leader position.

In a related argument, the plaintiff contends that the duration between Brady's learning about her 2012 complaint, which occurred in October 2012, and his decision to select Pilon over her, which occurred in late March 2013, permits an inference of retaliation. The plaintiff describes this as "suspicious timing." However, taking an adverse action against an employee five months after he or she complains about unlawful discrimination is not inherently suspicious.[6] What would have been inherently suspicious is Brady's learning about the plaintiff's EEO complaint and then immediately going out of his way to take an adverse employment action against her. For example, had Brady learned about the plaintiff's complaint and then immediately removed her from her temporary detail, a jury might have reasonably viewed Brady's actions as suspicious, even if he offered some legitimate reason for removing the plaintiff from the

---

[6] The plaintiff cites cases stating that the "mere passage of time is not legally conclusive proof against retaliation." *See, e.g., Malin v. Hospira, Inc.*, 762 F.3d 552, 559 (7th Cir. 2014). But these cases do not help her, as the defendant is not relying on the mere passage of time as its sole defense to the retaliation claim, and the cases do not stand for the proposition that taking an adverse action five months after receiving a complaint about discrimination is inherently suspicious.

15

detail. But nothing like that happened here. In fact, Brady extended the plaintiff's detail for an additional term after learning about her complaint against him, which cuts against the plaintiff's claim of suspicious timing.

In another "suspicious timing" argument, the plaintiff notes that Brady's last significant act before retiring was selecting Pilon rather than her for the team-leader position. Pl.'s Br. at 18. Although I am not exactly sure why the plaintiff finds this suspicious, the plaintiff seems to be arguing that Brady's imminent retirement gave him an opportunity to retaliate against the plaintiff without being disciplined by the USPIS, since he would no longer be employed there. I suppose that Brady's retirement did present him with a good opportunity to retaliate against the plaintiff without being disciplined. But Brady's being presented with this opportunity does not give rise to a reasonable inference that he actually took advantage of it to engage in unlawful retaliation.

Next, the plaintiff argues that Brady's failure to give her feedback about her interview before he retired gives rise to an inference that he harbored animosity against her. However, the plaintiff did not request feedback until two days before Brady's retirement. Brady states that he was unable to find time during these two days to meet with her, and that was why he did not provide her with feedback. Brady Decl. ¶¶ 32–34. Brady adds that he did not have time to provide feedback to any of the other candidates, either. *Id.* ¶ 34. Brady's explanation is reasonable, and his failure to provide the plaintiff with feedback during the two days before his retirement is not suspicious.

16

Next, the plaintiff points out that, during his six-year tenure as Inspector-in-Charge of the Chicago Division, Brady filled seven permanent supervisory positions, and in each case he selected a male for the position. The plaintiff argues that this implies that Brady is biased against females. However, the defendant has submitted a fuller picture of Brady's hiring record. During the course of his career with the USPIS, Brady was the selecting official for fifteen permanent or long-term (lasting two years or more) supervisory positions. No women applied for six of these positions. Brady selected a woman for two of the remaining nine positions, resulting in a female selection rate of 22%. During Brady's tenure, between 19% and 25% of USPIS inspectors were female, and between 15% and 22% of USPIS supervisory inspectors were female. Thus, Brady's career female selection rate of 22% is in line with the general composition of the USPIS and does not imply that he is biased against women.

The plaintiff also contends that Brady's having questioned the loyalty of a male applicant for the Milwaukee team-leader position supports her claim that Brady's selection of Pilon was motivated by unlawful retaliation. The plaintiff's argument begins with the premise that Brady and Hedrick eliminated an applicant named James Gursky from consideration because he had shown disloyalty to the USPIS by taking a job outside the agency while it was going through "tough times." The defendant disputes this premise, but for purposes of this motion I will assume that it is true. The plaintiff then argues that if Brady retaliated against Gursky for his disloyalty to the USPIS, it is reasonable to infer that Brady would retaliate against any employee who showed disloyalty in any form, including by filing a charge of discrimination. Thus, argues the plaintiff, Brady's having eliminated Gursky from consideration for the position gives rise

17

to a reasonable inference that he selected Pilon over the plaintiff because the plaintiff had filed an EEO complaint about Brady. This argument is not persuasive. Even if Brady considered Gursky to be disloyal because he abandoned the USPIS during tough times, it would not be reasonable to infer that he considered the plaintiff to be disloyal because she had filed an EEO complaint against him. Gursky's disloyalty was to the USPIS as an institution, while the plaintiff's supposed disloyalty was to Brady personally. In excluding Gursky because of his disloyalty to the institution, Brady could have been making a reasonable and lawful employment decision: because Gursky was not willing to stand by the USPIS during tough times, he would not make a good USPIS supervisor. In contrast, excluding the plaintiff because she had previously shown disloyalty to Brady personally by filing a discrimination complaint against him would have been petty and illegal. It is not reasonable to infer that a person who has done the former would also do the latter. Thus, Brady's actions with respect to Gursky do not support the plaintiff's retaliation claim.

In sum, the plaintiff's claim that Brady selected Pilon over her because of his gender and lack of EEO activity is based on weak circumstantial evidence. The plaintiff has no evidence that suggests gender discrimination. As for retaliation, the plaintiff has shown that Brady had a natural motive to retaliate against her for having accused him of discrimination, and that her applying for the team-leader position shortly before he retired presented him with an opportunity to retaliate. She has also shown that Brady's reasons for selecting Pilon are somewhat vague and based on subjective criteria. However, Brady's reasons are not so thin that they do not discharge the defendant's burden to produce a nondiscriminatory reason for the adverse employment action or

18

give rise to an inference of pretext on their own. Nor has the plaintiff pointed to any suspicious circumstances that could support a reasonable inference that Brady exploited his opportunity to retaliate by acting with a retaliatory motive. Accordingly, the defendant is entitled to summary judgment on the plaintiff's claims of gender discrimination and retaliation arising out of her non-selection for the team-leader position.

## B. Denial of Training and Development Opportunities

### 1. Factual background

The plaintiff claims that she was denied five training and career-development opportunities as retaliation for filing the EEO complaint against Brady regarding her non-selection for the Milwaukee team-leader position: (1) an opportunity to serve as a supplemental instructor at the USPIS Career Development Unit ("CDU"); (2) a detail on USPIS's Global Investigations unit at Chicago's O'Hare International Airport; (3) an opportunity to attend a conference relating to juvenile offenders in Wisconsin Dells, Wisconsin; (4) an opportunity to participate in a meeting in Washington D.C. as a subject matter expert ("SME"); and (5) a detail on an Organized Crime and Drug Enforcement Task Force.

The CDU supplemental instructor opportunity was a 13-week detail in which the selected inspector would provide basic postal-inspector training to new recruits. *See* Gomez Decl. Ex. 1033, ECF No. 22-1. On August 12, 2013, Hedrick sent an email announcing the CDU opportunity to team leaders within the Chicago Division. The Chicago Division set an internal deadline of September 16, 2013 for the nomination of candidates so that it could submit recommendations to CDU by September 20, 2013.

19

Def. PFOF ¶ 109.  However, the nominations did not have to be received by CDU until September 30, 2013.

After receiving Hedrick's email, Haraway, the plaintiff's team leader, asked her whether she was interested in the CDU detail, and she said that she was.  On August 15, 2013, Haraway sent an email to Hedrick nominating her for the detail and attaching the plaintiff's application.  ECF No. 31-17 at pp. 2–3.  On August 19, 2013, Hedrick forwarded the email to Gomez.  In reply, Gomez wrote "We should talk about this . . ." *Id.*  Hedrick wrote back saying that he agreed and that he and Gomez needed to talk about other matters in addition to the plaintiff's application.  Gomez wrote back: "Come on up brother!!!" *Id.*

On the same day that Hedrick forwarded the plaintiff's application to Gomez and asked to discuss things with him, Hedrick received a letter from the plaintiff's doctor stating that the plaintiff was experiencing a flare-up of a chronic condition and should be excused from strenuous physical activity.  ECF No. 21-14 at p. 3.  The next day, Hedrick forwarded the letter to Gomez, and the two men exchanged emails about whether the plaintiff could perform her duties as a postal inspector in light of her restriction against strenuous activity.  ECF No. 21-15.  Hedrick stated that the letter was too vague to determine whether she could perform her duties, and that he and Gomez would need to discuss what to do.

On August 23, 2013, the plaintiff sent an email to Haraway and Hedrick in which she requested to be considered for the Global Investigations detail.  ECF No. 31-18.  Hedrick forwarded the plaintiff's email and application for the Global detail to Gomez.  Later in the day on August 23, Gomez responded to Hedrick's email by informing him

20

that he would be recommending another inspector for the Global detail. In the email, Gomez also wrote that "We need to have a discussion with [the plaintiff] . . . Were [sic] not going to be moving her name forward for this detail or the supplemental [*i.e.*, the CDU supplemental instructor opportunity]." *Id.*

On September 12, 2013, an email was circulated to Gomez, Hedrick, and other supervisors within the Chicago Division listing the applicants for the supplemental-instructor opportunity. ECF No. 22-2. The applicants were the plaintiff and two other inspectors. Gomez immediately responded to the email by stating that the Division would not be submitting the plaintiff's name for the opportunity until her medical issues were resolved. *Id.* This was because CDU supplemental instructors must participate in strenuous physical activity, including survival and defense-tactics training, which would have violated the plaintiff's restriction against strenuous physical activity as stated in her physician's letter of August 16, 2013. However, on September 16, 2013, Hedrick received a written form from one of the plaintiff's doctors that indicated she had no restrictions that would prevent her from performing the duties of a postal inspector. ECF No. 21-16. Hedrick forwarded that form to Gomez on September 17th. However, Hedrick also noted that the doctor sent "another letter describing activities that might aggravate" the plaintiff's condition, but that neither he nor Gomez could read this letter unless the plaintiff granted them permission to do so. *Id.* Hedrick told Gomez that he would be asking the plaintiff to allow them to read the letter. The plaintiff later granted a USPIS nurse permission to release the letter to Hedrick and Gomez. On September 19th, the nurse emailed the letter to Hedrick. The letter stated that the plaintiff had no restrictions but might occasionally need to take sick days. Hedrick states that he did not

21

read this letter until late in the day on September 20th, as he was travelling on the 19th and could not open email attachments on his mobile device. The contents of the letter satisfied Hedrick and Gomez that the plaintiff could perform the duties of a CDU supplemental instructor. However, on that same day, September 20, 2013, Gomez recommended two female inspectors for the supplemental-instructor opportunity. Gomez states that, at the time he made these recommendations, he had not yet seen the letter from the plaintiff's doctor or been informed of its contents, and that his concerns about her medical condition and what might aggravate it were still unresolved. Gomez Decl. ¶ 22.

On August 28, 2013, the plaintiff asked Haraway if she could attend a juvenile-justice conference in Wisconsin Dells, Wisconsin, from September 18 to 20, 2013. The registration deadline for the conference was Friday, September 6, 2013. On September 3, 2013, Haraway emailed Hedrick to obtain approval for the plaintiff to attend the conference. On September 6, 2013, Hedrick emailed Haraway on another matter, and in response Haraway asked Hedrick if he had a chance to review the information regarding the juvenile-justice conference. Hedrick stated that he had, but that he was wondering how many juveniles the USPIS had dealt with in the last couple of years. Hedrick asked to speak to Haraway about it when he came to his office on the following Monday. Haraway responded "sure," but he did not remind Hedrick that the registration deadline for the conference would have passed by then. ECF No. 21-19. Neither Hedrick nor Haraway can recall whether they actually had a discussion the following Monday, or whether either one of them took any further action with respect to the plaintiff's request. Hedrick never communicated any decision on the request to either

22

Haraway or the plaintiff. Hedrick states that he never actually made a decision on the request because he simply forgot about it. Hedrick Decl. ¶ 75. However, Gomez recalls having a conversation with Hedrick and other members of his "upper management" about the plaintiff's request to attend this conference in which they decided that they would not approve it. Gomez EEO Dep. at 60–62, ECF No. 31-16. The reason Gomez gave for denying the request was that the subject of the conference was not germane to the plaintiff's duties as a postal inspector. *Id.* at 61. No other postal inspectors asked to attend the conference.

On September 6, 2013, the plaintiff, along with a number of other postal inspectors, received an email from Michael Ray, in which Ray requested that the recipients participate in a project within a broader "Revenue Investigations" program being held at headquarters in Washington, D.C. ECF No. 21-20. The plaintiff received this email because she had previously been designated as a subject matter expert ("SME") on revenue investigations. *See* Def. PFOF ¶¶ 74–80. The email stated that the revenue-investigations group would be hosting a planning session at headquarters on October 8 and 9, 2013. However, on October 8th, the plaintiff was scheduled to receive training on electronic surveillance and confidential informants ("ES/CI") in Chicago. The plaintiff asked Haraway if she could reschedule her training to attend the SME meeting. Haraway then emailed Hedrick about the plaintiff's request, told him he was okay with the plaintiff skipping the training to attend the meeting, and asked if Hedrick concurred. Hedrick stated that he preferred that the plaintiff attend the training. He also stated that he would contact Ray about the situation.

Case 2:15-cv-00439-LA   Filed 03/02/17   Page 23 of 44   Document 45

On September 9th, Hedrick wrote back to Haraway and told him that he had spoken to Ray, and that Ray informed him that the plaintiff's participation in the SME meeting was not required. Hedrick told Haraway to have the plaintiff attend her training on the assigned day. On September 10th, Haraway wrote back and asked if the plaintiff could reschedule her ES/CI training for October 10th in St. Louis and attend the SME meeting on October 8 and 9. Hedrick wrote back "Negative. She should attend the ES/CI training as scheduled." ECF No. 21-22. Hedrick then arranged for Ray to hold a one-on-one briefing over the phone with the plaintiff both before and after the SME meeting so that she could participate in future phases of the revenue-investigations program.

Hedrick did not give either Haraway or the plaintiff a reason for his decision to require the plaintiff to attend the ES/CI training on her assigned day. However, after the plaintiff alleged that his decision was retaliatory, Hedrick explained that he required her to attend the training on the assigned day because he believed she needed ES/CI training and thought that there was no need for her to attend the SME meeting, as Ray assured him that her attendance was not required and that she could still participate in future phases of the SME program. Hedrick also stated that he denied the plaintiff's request to take the ES/CI training course in St. Louis because the agency would have had to incur additional travel costs for her to do so.

Another postal inspector in the Chicago Division, Amanda Weisbacker, was also asked to participate in the SME meeting on October 8th and 9th. Like the plaintiff, Weisbacker was also scheduled for ES/CI training in Chicago on the 8th. But unlike the plaintiff, Weisbacker was allowed to take the training course in St. Louis so that she

24

could attend the SME meeting. Weisbacker was located in a different Domicile than the plaintiff, and that Domicile was not under Hedrick's supervision. Rather, a different Assistant Inspector-in-Charge, Victor Demtschenko, was responsible for Weisbacker's Domicile. Hedrick states he had no input or knowledge of Demtschenko's decision to allow Weisbacker to reschedule the training.

On November 18, 2013, the Criminal Investigations Group of USPIS circulated a notice to USPIS divisions seeking nominations for a 90–120 day detail as a Program Manager for the Organized Crime and Drug Enforcement Task Force. This task force is a conglomerate working group of state, federal, and local law-enforcement officers. The notice stated that nominations for the detail were due by the close of business on November 25, 2013. The nominations were to be submitted to the selecting official, Carols Rodriguez.

On November 22, 2016, Hedrick sent an email announcing the detail to the team leaders under his supervision, including Haraway. On November 25th, the day of the nomination deadline, Haraway informed Hedrick that the plaintiff wished to be considered for the detail. Had the plaintiff been assigned to the detail, she would have received a pay raise for its duration. That same day, Hedrick forwarded the plaintiff's request and application to Gomez, along with the message, "So far this is the only nomination I have received." ECF No. 22-3. On November 26th, one day after the deadline, Gomez forwarded the plaintiff's application to Rodriguez, whom he knew and considered a friend, along with the message, "Hey can we catch up bro???" *Id.* Shortly thereafter, Gomez spoke with Rodriguez by telephone. According to Gomez's account

of this conversation, Rodriguez assured Gomez that he would consider the plaintiff's application timely even though Gomez had submitted it one day late.

On December 5, 2016, the plaintiff asked Haraway if he had heard anything about the selection for the task-force detail. Haraway then emailed Hedrick to see what he knew, and Hedrick passed the request on to Gomez. Gomez, in turn, emailed Rodriguez and asked to talk about the detail. Rodriguez responded to the email and indicated that he would call Gomez, but he also told Gomez that he "didn't consider [the plaintiff] for the position" and that he "made a selection yesterday." ECF No. 22-4. Gomez does not recall having any other conversations with Rodriguez about the detail or asking him why he did not consider the plaintiff for the detail despite his earlier statement that he would.

### 2. Analysis

Before analyzing the evidence concerning each individual training and development opportunity, I note that the plaintiff has not identified any reason why Gomez and/or Hedrick would want to retaliate against her for accusing Brady of gender discrimination and unlawful retaliation. Obviously, Gomez was not involved in the decision to deny her the Milwaukee team-leader position and was not mentioned in the plaintiff's internal EEO complaint. Although Hedrick was involved in the interview process for the team-leader position, he was not a decisionmaker, and the plaintiff did not accuse him of discrimination or retaliation in her internal EEO complaint. *See* EEO Complaint of Discrimination in the Postal Service, ECF No. 25-10 at p. 10. The plaintiff has not argued that Hedrick and Gomez were so close to Brady that they would want to

26

retaliate against the plaintiff on his behalf.[7]  And the plaintiff has not suggested that either Hedrick or Gomez wanted to retaliate against her to discourage other postal inspectors from filing discrimination complaints.  Of course, the plaintiff need not introduce evidence of a retaliatory motive in order to survive summary judgment on a retaliation claim.  However, the lack of a retaliatory motive is part of the totally of the circumstances that I must consider when determining whether the plaintiff's evidence, which is entirely circumstantial, gives rise to a reasonable inference that Gomez and/or Hedrick retaliated against her by denying her training and development opportunities.

I also note that Hedrick approved a large number of training and development requests made by the plaintiff after he learned of her complaint against Brady.  *See* Hedrick Decl. ¶¶ 34–43, 45, 47–49.[8]  Although this does not mean that Hedrick did not retaliate against the plaintiff in connection with some of the opportunities discussed below, it certainly shows that Hedrick was not engaged in a broader campaign to deny the plaintiff training and development opportunities in general.  I will factor this into my

_____

[7] In her proposed findings of fact, the plaintiff points to evidence in the record showing that both Gomez and Hedrick met with and spoke to Brady after his retirement from the USPIS.  *See* Pl.'s Stmt of Add'l Facts ¶¶ 52–53.  However, in her brief, the plaintiff does not argue that Gomez and Hedrick were so close to Brady that they had a motive to retaliate on his behalf.  In any event, the cited evidence does not suggest that either man was especially close to Brady.  Gomez merely received a congratulatory phone call from Brady after he was named Brady's successor, visited Brady one time at the community college where he worked following his retirement, and ran into Brady at a professional conference.  The evidence as to Hedrick is that he saw Brady a few times at the community college while he was there to attend law-enforcement meetings and conferences.

[8] The plaintiff points out that some of Hedrick's approvals related to opportunities that were already "in the works" before the plaintiff filed her EEO complaint.  Pl.'s Br. at 28.  However, Hedrick also approved many of the plaintiff's "fresh" requests.  *See* Def. PFOF ¶¶ 79, 82, 84–86.

27

analysis of whether the plaintiff's evidence, which is circumstantial, gives rise to a reasonable inference that Hedrick acted with a discriminatory motive when he made some of the decisions discussed below.

### a.   CDU supplemental instructor detail

The defendant contends that Gomez did not recommend the plaintiff for the CDU supplemental instructor detail for two reasons.   First, at the time Gomez made his recommendation (September 20, 2013), Gomez was not yet satisfied that the plaintiff's restriction against strenuous physical activity was removed.   Second, Gomez had concerns about whether the plaintiff would be a "good ambassador" for the Chicago Division.   Gomez Dep. at 62–63; Gomez EEO Aff. (answer to question 31).   In Gomez's view, "[s]upplemental instructors at CDU are . . . responsible for imparting to new Postal Inspectors the honors and privileges associated with being a member of our organization."   Gomez Decl. ¶ 20.   Gomez states that he had concerns about the plaintiff's willingness to portray the Chicago Division in a positive light because, among other reasons, during his first meeting with her, the plaintiff expressed a desire to leave the Chicago Division and transfer to USPIS's Miami office.   *Id.*

The plaintiff contends that both of Gomez's stated reasons are pretextual.   First, she contends that her medical issue was fully resolved before Gomez submitted his recommendations for the detail.   She contends that this was because both Hedrick and Gomez knew by September 17, 2013, that her doctor had sent in a form that cleared her to return to work with no restrictions.   However, the emails between Hedrick and Gomez make clear that, even after they received this form, they still wanted to review the separate letter that the plaintiff's doctor had sent to the nurse about activities that

28

might aggravate her condition. Hedrick states that he was unable to review this letter until late in the day on September 20th, the day that the Chicago Division had set as its deadline for submitting recommendations to CDU, and that he did not inform Gomez of the letter or its contents until around the same time. Gomez states that by the time he learned of the letter's contents, which satisfied his concerns about the plaintiff's medical condition, he had already made his recommendations to CDU. Indeed, an email announcing his recommendations was sent to CDU at 1:28 p.m. on September 20th. *See* ECF No. 30-6. The plaintiff contends that a jury could disbelieve Hedrick's and Gomez's testimony about when they learned about the letter's contents. However, in general, a plaintiff cannot avoid summary judgment simply by positing that the jury could disbelieve a witness's testimony. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008); *J.D. Edwards & Co. v. Podany*, 168 F.3d 1020, 1025 (7th Cir. 1999) ("A plaintiff cannot win just by putting the defendant on the stand and asking the jury to disbelieve him."). And no evidence suggests that Hedrick and Gomez are lying about when they learned about what the letter said. In any event, there is no evidence that Gomez waited until the very last second to decide whom to recommend for the supplemental-instructor detail. To the contrary, emails reveal that Gomez and his upper management were in the final stages of making their recommendations by September 19th. *See* ECF No. 31-5. Thus, even if Gomez learned shortly before his recommendations were actually transmitted CDU that the plaintiff's doctor had completely and unambiguously removed all restrictions against strenuous physical

29

activity, that would not undermine his claim of having excluded her from consideration on the basis of her medical condition.[9]

Next, the plaintiff contends that Gomez's statement that he did not think that the plaintiff would make a "good ambassador" for the Chicago Division could reasonably be viewed as being directed towards her prior EEO activity. There are two ways to understand this argument. First, the plaintiff may be arguing that Gomez did not actually think that the plaintiff would not be a good ambassador and that he offered this as a reason in order to mask his true reason, which was to punish her for accusing Brady of discrimination. This argument is not persuasive. Gomez explained at his deposition the reasons why he thought that the plaintiff would not be a good ambassador, which were (1) that she expressed to him that she wanted to leave the Chicago Division and transfer to Miami and (2) she generally seemed dissatisfied with the way the Chicago Division was managed. Gomez Dep. at 62–66. No evidence suggests that these reasons are false. Indeed, the plaintiff does not dispute that she wanted to leave the Chicago Division or that she was dissatisfied with its management. The plaintiff notes that it is common for postal inspectors to transfer to different offices to take advantage of career opportunities. Although that may be true, this does not undermine Gomez's explanation for why he thought she would not be a good ambassador. As Gomez explained it, he found it odd that during the plaintiff's very first

---

[9] The plaintiff also notes that CDU accepted recommendations for the detail until September 30, 2013, and that therefore Gomez still had ten days to recommend her for the detail after he learned that her medical issues were not a concern. However, it is undisputed that the Chicago Division set a deadline of September 20, 2013, for it to submit its recommendations to CDU. Def. PFOF ¶ 109. Therefore, there is nothing suspicious about Gomez's not submitting new recommendations after September 20th.

30

meeting with the new boss of the division she would express a desire to leave the division. *Id.* at 65:22–66:5. While it may be common for postal inspectors to transfer to other offices, this does not mean it is unreasonable for a supervisor to infer that a postal inspector is not excited about her current division when she immediately tells him that she is trying to transfer out of it. Thus, a jury could not reasonably infer that Gomez's "good ambassador" reason was pretextual.

The second way to understand the plaintiff's "good ambassador" argument is as a challenge to the legitimacy of using the plaintiff's attitude toward the Division as a reason for denying her the CDU detail. That is, the plaintiff may be arguing that the reason she was dissatisfied with Chicago Division management is that she felt that she had been repeatedly subjected to gender discrimination and retaliation for filing discrimination complaints. Thus, in using her dissatisfaction as a reason to deny her the CDU opportunity, Gomez was in effect denying her the opportunity because she had complained about unlawful discrimination. However, there is a difference between retaliating against a person for filing a charge of discrimination, and concluding that a person's dissatisfaction with her employer—which may stem from the person's perception that she has been the victim of unlawful discrimination—makes her a poor candidate for a position that involves portraying the employer in a positive light. The former is unlawful, the latter is not. In the present case, the plaintiff does not dispute that Gomez thought that it was important for the person he recommended for the supplemental-instructor position to have a positive attitude about the USPIS and the Chicago Division. Thus, the plaintiff's dissatisfaction with Chicago Division

31

management was a legitimate factor for Gomez to consider when deciding whether to recommend her for that position.[10]

Finally, the plaintiff contends that suspicious timing and the defendant's shifting justifications support an inference that its reasons for denying her the CDU opportunity are pretextual. With respect to suspicious timing, the plaintiff notes that, on August 22, 2013, Hedrick was asked to complete an affidavit regarding the plaintiff's EEO complaint about her non-selection for the team-leader position. The very next day, Gomez sent an email stating that the plaintiff's name would not be submitted for the CDU position or the Global detail. The plaintiff seems to be suggesting that the request for Hedrick to complete the EEO affidavit prompted Gomez to engage in retaliation. This argument is not persuasive. By the time Gomez sent his email, both he and Hedrick had known about the plaintiff's EEO complaint against Brady for months. A jury could not reasonably conclude that the more recent request for Hedrick to fill out the affidavit prompted Gomez to retaliate. This is especially true given that the plaintiff did not even accuse Hedrick of discrimination; rather, he was only asked to complete an affidavit because he was a witness to the events that gave rise to her claim against

---

[10] The plaintiff notes that Gomez did not have any concerns about her not being a good ambassador when she applied for a detail on the organized-crime task force. She seems to be suggesting that this allows a reasonable jury to infer that Gomez did not really have concerns about her ability to represent the Division when he decided not to recommend her for the CDU position. However, Gomez testified that he was worried about the plaintiff's ability to be a good ambassador in the context of the CDU position because that position involved instilling pride in new USPIS recruits. Gomez Dep. at 63. The task-force detail, in contrast, did not involve teaching new recruits and, so far as the record reveals, did not otherwise require the selected inspector to be a cheerleader for the USPIS or the Chicago Division. Thus, it was reasonable for Gomez to be concerned about the plaintiff's attitude toward the Division when making recommendations for the CDU position and to not be concerned about her attitude when making recommendations for the task-force detail.

Brady. In contrast, it would be reasonable for the jury to infer that Gomez's email about not considering the plaintiff for the CDU and Global opportunities was prompted by the letter from the plaintiff's doctor indicating that she was restricted from participating in strenuous physical activity. Gomez received notice of the restriction on August 20, 2013, which was only three days before Gomez sent the email stating that the plaintiff would not be considered for these opportunities.

As for shifting justifications, the plaintiff first notes that when the Postal Service's EEO office asked Hedrick to complete an affidavit regarding the plaintiff's retaliation complaint, he stated that the reason the plaintiff was not recommended for the CDU position was her unresolved medical issue. *See* ECF No. 25-8 (answer to question 52). Later, at his deposition, Hedrick stated that the medical issue was a "primary reason" but that other factors were also considered and may have played some role in the decision. *See* Hedrick Dep. at 124, 172–73. The difference between Hedrick's EEO affidavit and his deposition testimony does not amount to a shifting justification. Rather, all of Hedrick's statements are consistent with the medical issue being the main reason for the decision, with the other issues possibly also playing some role. That is, when Hedrick filled out the form asking him to state his reason for his decision, he listed the primary reason, i.e., the medical condition. And when plaintiff's counsel asked for Hedrick's reason at the deposition, the first thing he mentioned was the plaintiff's medical issue. Hedrick Dep. at 124. When plaintiff's counsel asked follow-up questions, Hedrick then mentioned some other reasons that might have played a role. *Id.* Hedrick's statements are thus consistent and do not give rise to a reasonable

33

inference that he is lying about why the plaintiff was not recommended for the CDU position.

Next, the plaintiff contends that Gomez offered shifting justifications for his decision not to recommend the plaintiff for the CDU position. She notes that Gomez cited both her medical issue and the "good ambassador" reason in his EEO affidavit, *see* ECF No. 25-5 (answer to question 31), but mentioned only the medical issue in his deposition until plaintiff's counsel referred him to his affidavit, *see* Gomez Dep. at 41, 62-63. Again, this could not be reasonably construed as a shifting justification. Gomez cited both reasons in his affidavit, and Gomez's at first mentioning only the medical issue during his deposition is consistent with its being the primary reason for the decision. And the way the "good ambassador" reason came up at the deposition is not suspicious. Plaintiff's counsel simply asked Gomez whether he could explain why he wrote that in his affidavit, and then Gomez said "Yes absolutely" and proceeded to explain why he thought the plaintiff would not have been a good ambassador. Gomez Dep. at 62:24–63:4. Gomez did not deny that his opinion about the plaintiff's ability to serve as an ambassador played some role in his decision. Had he done so, then the plaintiff might be able to accuse Gomez of having offered shifting justifications.

In sum, a jury could not reasonably infer from the plaintiff's evidence that the reasons Hedrick and Gomez gave for not recommending the plaintiff for the CDU supplemental instructor position are pretextual.

### b. Global Investigations detail

Gomez gave three reasons for not recommending the plaintiff for the Global Investigations detail at O'Hare airport: (1) to minimize travel costs, he wanted to

34

nominate an inspector who lived in the Chicago area; (2) the plaintiff had just completed a 7-month detail and he wanted to give a different postal inspector a chance to serve on a detail; and (3) at the time he made his nomination, Gomez had concerns over the plaintiff's medical restriction against physical activity. The inspector that Gomez eventually recommended for this detail, Ryan Kucera, resided in the Chicago area and had no previous detail experience.

The plaintiff contends that a reasonable jury could find that Gomez's stated reasons are pretextual. First, she notes that in his EEO affidavit, Gomez answered "no" to questions asking him whether the plaintiff applied for the detail and whether he considered her for it. *See* ECF No. 25-5 (answers to questions 18 & 24). I fail to see how that helps her case. In the affidavit, Gomez does not deny that he recommended Kucera for the detail, and he gave reasons for not recommending the plaintiff for the detail, namely, that she was located in Milwaukee rather than Chicago and had just completed a lengthy detail. I am not sure why Gomez answered "no" to the questions about whether the plaintiff applied for and was considered for the detail. Possibly he did not think that anyone actually needed to apply for this detail and that it was simply up to him to recommend someone. But given that he later gave reasons for not recommending the plaintiff for the detail, it is clear that he was not hiding anything by answering "no" to these questions.

Next, the plaintiff contends that Gomez gave shifting justifications for not recommending her for the detail. As noted, in his EEO affidavit, Gomez gave two reasons for not recommending the plaintiff: (1) she resided in Milwaukee, and (2) she had just completed a lengthy detail and he wanted to give a different inspector a chance

35

to serve on a detail.  However, at his deposition, Gomez also testified that the plaintiff's unresolved medical issue played a role in his decision.  But when plaintiff's counsel initially asked Gomez if the plaintiff's medical condition factored into his decision, he said no.  Gomez Dep. at 49:13–15.  It wasn't until later in the deposition that Gomez changed his answer and said that the medical issue was a factor.  *Id.* at 50:4–15, 76:12–23.  The plaintiff contends that this is suspicious.  However, Gomez's testimony in his affidavit and at his deposition make clear that he did not select the plaintiff for the Global detail primarily because she resided in Milwaukee and had just completed a lengthy detail.  But at the same time that recommendations for the Global Detail were being discussed, the plaintiff submitted the letter from her doctor restricting her from strenuous physical activity.  Gomez testified that the medical issue was a concern for him around this time and that the concern was not limited to any specific detail but extended to her ability to perform her job as a whole.  *Id.* at 53:5–17.  Gomez gave this testimony almost immediately after testifying that the plaintiff's medical condition was not a reason she did not get the Global detail.  Later, counsel for the defendant asked Gomez to clarify whether the medical condition was a factor in his decision to not recommend the plaintiff for the detail, and Gomez answered that it was a factor, but that it was not "more of a factor than another."  *Id.* at 76:12–18.  Viewing this testimony as a whole, it is clear that what Gomez is saying is that although the plaintiff's medical condition was generally a concern at the time and factored into his decision on some level, it was not a primary reason for his decision.  In any event, at most, Gomez's failing to mention the medical condition until prompted to do so by his own counsel

36

would cast doubt on whether the medical reason actually played a role in the decision. It would not also suggest that Gomez's other reasons are pretextual.

Next, the plaintiff argues that Gomez's concern about travel costs could reasonably be seen as pretextual because the plaintiff had offered to house herself in the Chicago area at no cost to the agency. *See* ECF No. 31-18. However, when plaintiff's counsel asked Gomez at his deposition why the plaintiff's offer to house herself did not alleviate his financial concern, Gomez answered, "It doesn't work that way." Gomez Dep. at 48:23–49:2. In his declaration, Gomez expands on this answer by noting that allowing the plaintiff to pay for her own housing would be inconsistent with USPIS policy and would have raised other concerns. Gomez Decl. ¶ 26. The plaintiff does not dispute that Gomez's understanding of USPIS policy was accurate or contend that his other concerns were unfounded. Thus, a jury could not reasonably infer that Gomez's financial concern was pretextual.

Finally, the plaintiff makes the same suspicious timing argument that she made with respect to the CDU supplemental instructor opportunity, *i.e.*, that Gomez wrote the email stating that he would not be recommending the plaintiff for either the CDU opportunity or the Global detail one day after Hedrick received a request to complete an EEO affidavit in connection with the plaintiff's retaliation complaint against Brady. However, as I explained in my discussion of the CDU opportunity, the timing of Gomez's email is not suspicious.

In sum, a jury could not reasonably infer from the plaintiff's evidence that the reasons Gomez gave for not recommending the plaintiff for the Global detail are pretextual.

37

### c.     Wisconsin Juvenile Justice conference

When Hedrick first received the plaintiff's request to attend this conference, he inquired as to whether the USPIS interacted with juveniles frequently enough to warrant incurring the expense of sending an inspector to the conference. Hedrick Dep. at 149–50. However, no one can remember whether Hedrick ever received an answer to his inquiry, and Hedrick testified that he simply forgot about the plaintiff's request, and that that was why the plaintiff's request to attend the conference was never approved. At his deposition, Gomez testified that he talked to Hedrick about the plaintiff's request to attend this conference, that the two of them questioned whether the conference was "germane" to the plaintiff's duties, and that they decided to deny her request to attend. Gomez Dep. at 60–61. Although Hedrick's testimony and Gomez's testimony conflict slightly, in that Hedrick testified that no decision was made because he forgot to follow up, while Gomez testified that they actually decided to deny her request, this is not suspicious. Both men agree that the reason they were hesitant to approve the request was because they questioned whether it was relevant to the plaintiff's duties. Their different memories as to whether they actually made a decision to deny the request or simply forgot to follow up is not evidence of pretext or unlawful retaliation.

Once again, the plaintiff also cites suspicious timing, in that she requested to attend this conference around the time that Hedrick was asked to complete his EEO affidavit with respect to her claim against Brady. But as I have already explained, there is no reason to think that Hedrick's being asked to complete this affidavit as a witness would prompt him to retaliate against the plaintiff. Thus, the plaintiff's evidence does

38

not give rise to a reasonable inference that either Hedrick's or Gomez's conduct with respect to her request to attend this conference was retaliatory.

### d. SME meeting

The parties agree that the Revenue Investigations subject matter expert meeting conflicted with the plaintiff's scheduled training on electronic surveillance and confidential informants ("ES/CI"). The question is whether the plaintiff's evidence would allow a reasonable jury to infer that Hedrick's refusal to allow her to reschedule this training for a later date in St. Louis was motivated by a desire to retaliate against her for having filed a discrimination complaint against Brady. Hedrick states that he did not allow the plaintiff to reschedule her training because Michael Ray, the SME coordinator, assured him that the plaintiff did not need to attend the meeting in order to participate in other phases of the SME program, and because Ray agreed to talk to the plaintiff both before and after the meeting. Hedrick also did not want to incur the additional travel costs associated with the plaintiff's taking the ES/CI training course in St. Louis rather than in Chicago.

The plaintiff contends that a jury could reasonably infer that Hedrick's reasons are pretextual because a different postal inspector, Amanda Weisbacker, was allowed to reschedule her ES/CI training so that she could attend the SME meeting. However, Weisbacker did not report to Hedrick, and Hedrick was not involved in her supervisor's decision to allow her to reschedule the training. So this is not a case in which Hedrick treated two similarly situated employees differently. The plaintiff notes that Gomez would have had to approve both Hedrick's decision to deny the plaintiff's request to reschedule and Weisbacker's supervisor's decision to allow her to reschedule.

39

However, there is no evidence that Gomez asked the supervisors to give him their reasons for the decisions they made, or that he concurred in the disparate decisions even though the supervisors identified no legitimate reasons for treating the plaintiff and Weisbacker differently. Indeed, the inspectors' requests related to a relatively minor issue—whether to reschedule a single training session to attend a single meeting—and it seems unlikely that the Inspector in Charge would be heavily involved in such an issue. Thus, Gomez's concurrence in both decisions does not imply that he approved Hedrick's decision in order to retaliate against the plaintiff for accusing Brady of unlawful discrimination and retaliation.

The plaintiff also notes that, on one prior occasion in 2012, before the plaintiff had filed any EEO complaint, Hedrick approved a request for her and another inspector to attend training in St. Louis instead of Chicago. The plaintiff implies that this suggests that Hedrick's denial of her more recent request to attend training in St. Louis was retaliation for her complaint against Brady. However, in 2012, both the plaintiff and her colleague had significant conflicts on the date of the training. The plaintiff's colleague could not attend training on the scheduled date because he could not find childcare. And the plaintiff could not attend training on the scheduled date because she had to testify before a grand jury. In contrast, with respect to the plaintiff's 2013 request, Hedrick spoke with the SME coordinator and confirmed that the plaintiff did not need to attend the specific meeting that conflicted with her training in order to participate in other aspects of the SME program. Thus, the circumstances surrounding the 2012 and 2013 requests were different, and Hedrick's allowing the plaintiff to reschedule her 2012

40

training but not her 2013 training does not suggest that he was retaliating against her for filing an EEO complaint in the interim.

### e.     Organized Crime and Drug Enforcement Task Force

The plaintiff was not selected for a detail on the Organized Crime and Drug Enforcement Task Force. However, the selecting official for this detail was Carlos Rodriguez, and the plaintiff does not argue that Rodriguez selected someone else for the detail in order to retaliate against her for filing a complaint against Brady. Rather, she focuses on the conduct of Carlos Gomez, who submitted her application for the detail one day after the deadline had passed. The plaintiff notes that Gomez claims to have been assured by Rodriguez that he would consider the plaintiff's application timely even though he submitted it one day too late, yet Rodriguez later wrote an email in which he said that he did not consider her for the position.

The plaintiff contends that Rodriguez's email about not considering the plaintiff "casts doubt on INC Gomez's explanation." Pl.'s Br. at 28. But what "explanation" is the plaintiff referring to? Gomez did not offer any explanation for his failure to submit the plaintiff's application on time, and because he was not the selecting official, he did not offer any explanation for not selecting the plaintiff for the detail. What the plaintiff seems to be arguing is that because Rodriguez's email about not considering the plaintiff for the position contradicts Gomez's claim to have received Rodriguez's assurance that he would consider the plaintiff's application even though it was untimely, the jury is free to infer that Gomez must have exerted pressure on Rodriguez to deny her the detail in order to retaliate against her for filing a discrimination complaint against Brady. However, this is not a reasonable inference to draw from the evidence. Gomez

41

did not have any apparent motive to retaliate against the plaintiff for filing a charge against Brady, and no evidence suggests that he would go so far as to ask his colleague to participate in an unlawful retaliatory scheme.

The plaintiff contends that Rodriguez's email about not considering the plaintiff for the detail allows the jury to question Gomez's truthfulness. She then cites cases noting that when a plaintiff succeeds in showing that a defendant's legitimate, non-discriminatory reason for taking an adverse employment action is false, the jury may reasonably infer that the true reason for taking the action was unlawful discrimination. *See Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003); *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995). However, Gomez's alleged untruthful statement did not relate to USPIS's legitimate, non-discriminatory reason for not selecting the plaintiff for the task-force detail. Indeed, the plaintiff has not made out a prima facie case in connection with this employment decision, and thus the USPIS's burden to offer a non-discriminatory reason for its non-selection of the plaintiff has not been triggered.[11] Thus, these cases are inapplicable. Moreover, no authority of which I am aware suggests that a jury could reasonably infer from the discrepancy between Gomez's statement and Rodriguez's email that (1) Gomez persuaded Rodriguez to not select the plaintiff for the detail *and* (2) Gomez did so in order to retaliate against the

---

[11] The plaintiff has not made out a prima facie case of retaliation in connection with the task-force detail because she has not shown that she was treated less favorably than similarly situated employees who did not engage in protected activity. *See Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). The plaintiff was the only inspector in the Chicago Division who applied for the detail, *see* Def. PFOF ¶ 147, and the plaintiff has not identified the inspector that Rodriguez selected for the detail, much less shown that this inspector did not engage in protected activity.

42

plaintiff for filing a discrimination complaint against Brady. Accordingly, the defendant is entitled to summary judgment on this claim.

### 3. Conclusion as to retaliation claims

For the reasons discussed above, a reasonable jury could not infer that the plaintiff was denied any of the five training-and-development opportunities because she filed an EEO complaint against Brady. Although the plaintiff does not contend that a reasonable inference of retaliation emerges when the five denials are viewed in the aggregate, for the sake of completeness I note that the defendant's undisputed evidence shows that the plaintiff generally received at least as much training and development as other postal inspectors during the approximately one-year period after she filed her complaint. *See* Def. PFOF ¶¶ 87–88. Thus, the evidence does not suggest that the USPIS was engaged in some broader pattern of retaliation against the plaintiff.

## C. Administrative Motions

Before concluding, I address two administrative matters. First, the defendant filed a motion to seal a portion of the summary-judgment record. The sealed material consists of information in the plaintiff's and Francis Pilon's application and interview materials for the Milwaukee team-leader position. These materials contain personal information about the applicants such as social security numbers and home addresses. They also contain sensitive criminal investigatory information disclosed by the applicants during the application process, including information about USPIS methods for preparing technical reports, conducting investigations, developing cases, and registering confidential informants. The defendant has filed publicly available versions

43

of all documents with the sensitive material redacted. The publicly available versions contain all of the information that a member of the public would need to understand and evaluate my decision on the motion for summary judgment. For these reasons, I conclude that the defendant has shown good cause for sealing the unredacted versions, and I will grant its motion to seal.

The other motion is the plaintiff's motion to file a sur-reply brief and additional evidentiary material in opposition to the plaintiff's motion for summary judgment. I will grant this motion.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion for summary judgment (ECF No. 18) is **GRANTED**. The Clerk of Court shall enter final judgment.

**IT IS FURTHER ORDERED** that the defendant's motion to seal (ECF No. 17) is **GRANTED**.

**FINALLY, IT IS ORDERED** that the plaintiff's motion for leave to file a sur-reply brief (ECF No. 42) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 2nd day of March, 2017.


s/ Lynn Adelman
_____
LYNN ADELMAN
United States District Judge

44